GLENN BASS, Plaintiff-Appellant, v. CINCINNATI INCORPORATED, Defendant-Appellee.

First District (3rd Division)   No. 1—92—1435

Opinion filed June 19, 1996.

Joseph R. Curcio, Ltd., of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellant.

Schaffenegger, Watson & Peterson, Ltd., of Chicago (Donald G. Peterson, John J. Piegore, and Eleanore P. Cabrere, of counsel), for appellee.

JUSTICE RIZZI delivered the opinion of the court:
Plaintiff, Glenn Bass, brought this product liability action to re-

cover damages for an injury he received while operating a press brake machine (press) that had been manufactured by defendant Cincinnati Incorporated. A jury returned a verdict in favor of defendant, and plaintiff appeals from the judgment entered on the verdict. We affirm.

The press was manufactured by defendant in 1969 and shipped to plaintiff's employer, Trailmobile, in January 1971. Trailmobile is a trailer manufacturer. The press is used to form pieces to related larger parts, by bending or punching metal. It is multifunctional, capable of forming pieces to parts for a wide variety of industries and uses, including the formation of pieces to parts for radiators, light fixtures, elevator panels, partitions, etc. Different tooling and dies are used, depending on the use to which the press is put. Defendant did not sell or distribute tooling or dies to Trailmobile.

At the time the press left defendant's control, it was equipped with alternative methods of operation, one set of dual palm buttons and two foot switches. Dual palm buttons are used to operate the press when forming relatively small pieces, and foot switches are used to operate the press when forming larger pieces that have to be held while the press is functioning. A trailer manufacturer such as Trailmobile may have a need for both uses.

Plaintiff began working for Trailmobile in April of 1977, as a helper in the fabrication department. As a helper, he assisted an operator of press brake machines, making and punching out pieces to parts for semi-trailer vehicles. The only training that plaintiff received for the operation of the machines consisted of someone running a few parts through the operating machines and showing plaintiff how the operation was performed. The particular machine was then turned over to plaintiff to finish the job.

Trailmobile had set-up men who would make measurements and adjustments on the machines before operation for particular projects. On the day of the accident, May 16, 1977, Doug Armer set up the press for plaintiff to operate. Armer testified that on that day, he gave plaintiff warnings about the dangers of the machine. He warned plaintiff three times before operating the press not to put his hands in the press. Armer was face-to-face with plaintiff when he gave each of the three warnings to plaintiff. Armer was less than five feet away from plaintiff when the warnings were given.

Plaintiff had used the press on three or four occasions before the accident; on those occasions, he used the machine along with another operator. At the time of the accident, the function he was performing was one which was done by a single operator. The selection of either dual palm buttons or foot switches is made by the set-up person using a key-controlled selector.

Plaintiff was standing in front of the press and punching a quarter-inch sheet of aluminum measuring approximately 12 inches long by 6 inches wide. Because the holes were not aligned when he used the press for this operation, plaintiff determined it was necessary to make an adjustment. He attempted to do this by putting his right arm between the upper and lower dies of the press. When he did this, he also apparently depressed the foot switch on the press, and the press became activated, severely injuring his arm between the wrist and elbow. After the accident, a maintenance supervisor determined that all controls were operating properly on the press. There appears to have been no functional defect in the press.

Plaintiff's arm was surgically treated, and the arm was not amputated. Six years later, however, the same arm was traumatically amputated in an unrelated motorcycle accident. In the present lawsuit, plaintiff seeks damages from the time of the press accident until the motorcycle accident.

At trial, plaintiff acknowledged that he knew that it was dangerous to put his hands between the upper and lower dies on the press. He also knew before the accident that he could be seriously injured if he put any part of his body between the dies and depressed the foot switch. He also knew that the press was on, as opposed to being turned off, at the time. He testified, however, that he did not know that he could have gone around the back of the press to make an adjustment and to turn the press off.

One of plaintiff's expert witnesses was Donald Pull. Pull is a nondegreed mechanical engineer with one year of training. He has no disclosed qualification to express opinions as a statistician. Pull is chairman of Lightguards, Ltd., which is a British company with its place of business in Hertfordshire, England. Pull's company developed a safety sensing device called Lightguard. No attempt was ever made to market Lightguard in the United States.

Pull's testimony was given by videotape evidence deposition taken at Hertfordshire, England. Pull's expert opinions were admitted into evidence, and hearsay data underlying his opinions was admitted into evidence to explain and illustrate his opinions. The trial court, however, ruled that Pull's hearsay testimony of United Kingdom government statistics was not sufficiently reliable to be admitted into evidence. Plaintiff claims that the trial court erred and that he is therefore entitled to a new trial.

■ The actual statistics from the United Kingdom were not offered into evidence. We have in the record only a testimonial summation by Pull of that data. The guarantee of trustworthiness of public records does not apply to mere testimonial summations of public re-

cords. *People v. McClinton*, 59 Ill. App. 3d 168, 175, 375 N.E.2d 1342, 1348 (1978). Moreover, in the present case there is no explanation of why the purported data itself was not procured and identified.

■ Hearsay data of an expert witness must be of the type customarily relied upon by experts in the field and the data must be sufficiently trustworthy to make the reliance reasonable. *Lovelace v. Four Lakes Development Co.*, 170 Ill. App. 3d 378, 383, 523 N.E.2d 1335, 1339 (1988). The admissibility of data underlying an expert's opinion is within the sound discretion of the trial court. The trial court in its discretion determines whether the underlying facts upon which an expert bases his or her opinion are reasonably relied upon, and hearsay evidence that in the trial court's discretion is found not reliable is properly excluded. *City of Chicago v. Anthony*, 136 Ill. 2d 169, 186, 554 N.E.2d 1381, 1389 (1990).

■ Moreover, an expert need not be allowed to state the underlying facts or data of his or her opinion when their probative value in explaining the expert's opinion pales beside their likely prejudicial impact or their tendency to create confusion. *City of Chicago v. Anthony*, 136 Ill. 2d at 186, 554 N.E.2d at 1389. Here, the record clearly demonstrates that Pull's testimony about United Kingdom statistics would have no probative value to the case, and would, instead, have a tendency to create confusion. Under the circumstances, the trial court properly exercised its discretion in excluding Pull's testimony about United Kingdom statistics. We therefore reject plaintiff's first argument on appeal.

■ Plaintiff next argues that "the trial court erred in submitting the issue of assumption of risk to the jury." The jury, however, was instructed on assumption of risk without objection. Moreover, verdict forms for plaintiff and for defendant were given without objection, and assumption of risk was addressed only in the verdict forms for the plaintiff, which the jury did not sign. The verdict form signed by the jury in favor of the defendant did not address assumption of risk. Thus, the verdict of not guilty for defendant renders any claimed error on assumption of risk harmless.

In *Cleveringa v. J.I. Case Co.*, 230 Ill. App. 3d 831, 854, 595 N.E.2d 1193, 1209 (1992), there was, as in the present case, no finding of assumption of risk in the signed verdict for defendant. The court stated:

> "Moreover, as defendant has pointed out, any purported error committed by the trial judge on this issue would be deemed harmless where the jury's verdict reflected that the defendant's product was not unreasonably dangerous. (See *Puckett v. Empire Stove Co.* (1989), 183 Ill. App. 3d 181, 193, 539 N.E.2d 420.) In the instant case, the trial court instructed the jury to consider plaintiff's as-

sumption of risk only if it found for the plaintiff. The jury entered a verdict in favor of defendant Case, finding that Case was not liable for plaintiff's injuries. Consequently, the jury did not reach the issue of plaintiff's assumption of risk, and plaintiff is not entitled to reversal of the verdict on this basis." 230 Ill. App. 3d at 854, 595 N.E.2d at 1209.

Here, the jury was also instructed to consider assumption of risk only if it found for the plaintiff, which is in accord with comparative fault principles in product liability cases. See *Erickson v. Muskin Corp.*, 180 Ill. App. 3d 117, 122, 535 N.E.2d 475, 478 (1989). Since the jury did not find for the plaintiff, the claimed error in submitting assumption of risk to the jury is harmless, if error did occur. In addition, the record establishes that there was no error in submitting the issue of assumption of risk to the jury. See *Cleveringa v. J.I. Case Co.*, 230 Ill. App. 3d 831, 595 N.E.2d 1193; *Martinet v. International Harvester Co.*, 53 Ill. App. 3d 213, 368 N.E.2d 496 (1977); *Hackett v. Equipment Specialists, Inc.*, 201 Ill. App. 3d 186, 559 N.E.2d 752 (1990).

■ Plaintiff's next argument relates to the order of proof at trial. Plaintiff contends that the trial court erred in not admitting evidence of defendant's net worth until the conclusion of plaintiff's case in chief. The net worth of defendant was put in evidence to prove punitive damages. The jury returned a verdict of not guilty on the issue of alleged wilful and wanton conduct, thus mooting any punitive damage question. Moreover, the order of proof at trial is in the discretion of the trial court. *Laird v. Illinois Central Gulf R.R. Co.*, 208 Ill. App. 3d 51, 78, 566 N.E.2d 944, 960 (1991); see also 107 Ill. 2d R. 233. Finally, on this point in plaintiff's brief, there is no authority cited to support plaintiff's theory that the trial court erred in setting the order of proof at trial. There is no authority to support plaintiff's theory and no merit to his argument.

■ Plaintiff also argues that the trial court erred in allowing defendant to demonstrate dissimilarities between other accidents and the accident involved in the present case. The trial court allowed plaintiff to put in evidence 128 other accidents involving press brake machines. Plaintiff contends that the trial court erred, however, in allowing defendant to ask a defense witness: "Do you have an opinion as to whether the other 128 involved similar machines?" The 128 occurrences referred to in the question are recorded in plaintiff's exhibits 27 and 28, which were admitted in evidence. The witness is the author of the data in those exhibits.

Defendant offered evidence of differences between other press brake accidents and the subject accident to meet plaintiff's claim that the press was both unreasonably dangerous and the proximate

cause of the accident upon which plaintiff sued. Prior or subsequent accidents only "tend[ ] to show that a product is dangerous or defective." *Bass v. Cincinnati, Inc.*, 180 Ill. App. 3d 1076, 1080, 536 N.E.2d 831, 833 (1989). Thus, the admission of the 128 other accidents into evidence was not a finding that the press in the present case was unreasonably dangerous or that proximate cause was established. It follows that defendant was not precluded from contesting the inference plaintiff sought to make.

Defendant therefore properly introduced evidence of the details of the other accidents to show that the proximate cause of the other accidents was not an unreasonably dangerous condition of the press brake that was involved in each of those accidents. See *Loitz v. Remington Arms Co.*, 138 Ill. 2d 404, 563 N.E.2d 397 (1990). It is the jury's function to weigh such evidence in determining whether the product in the case before it is unreasonably dangerous and whether proximate cause is established. Thus, the trial court did not err in allowing defendant to demonstrate dissimilarities between the other accidents and the accident involved in the present case. Plaintiff's argument is untenable.

■ Plaintiff's next argument relates to defendant's closing argument to the jury. Prior to closing arguments, the trial court directed that the contents of a research and development report known as the Waveguard R&D Report not be discussed in closing arguments. The report was marked defendant's exhibit 25. Plaintiff contends that in his closing argument defense counsel improperly referred to the Waveguard R&D Report. The record, however, does not support plaintiff's contention.

The record reflects that during closing argument defense counsel did not refer to defendant's exhibit 25, but rather referred to a different report, which had been admitted into evidence as plaintiff's exhibit 51. At the time, plaintiff's counsel objected, and in his objection made reference to the Waveguard R&D Report, which was defendant's exhibit 25; defense counsel, however, made no reference to the Waveguard R&D Report. In sum, defense counsel's argument to the jury was not improper. Moreover, even if defense counsel had referred to the Waveguard R&D Report as suggested by plaintiff in his brief, the reference would constitute harmless error based upon the whole record.

■ Lastly, plaintiff argues that the verdict is against the manifest weight of the evidence and that the trial court erred in denying his motion for judgment notwithstanding the verdict. The record plainly demonstrates that neither of these arguments has merit. When the press left defendant's control in 1971, it was equipped with what the

jury found to be an appropriate safety device, dual palm buttons for the type of operation that was being engaged in by plaintiff. If the dual palm buttons operation would have been used at the time, the jury felt that the accident would not have occurred. At trial, plaintiff's product expert witnesses were contradicted by defendant's product expert witnesses. Judged by its verdict, the jury believed the defense expert witnesses rather than plaintiff's expert witnesses. There is nothing to establish that the jury had no right to its belief.

When a case is tried to verdict, one party "loses," and the other "wins." That is the consequence of every case that is allowed to be tried to verdict. After the fact, the jury's verdict may, as in the present case, seem harsh. That too is the consequence of a case that is allowed to be tried to verdict. Reviewing courts, and the parties, must appreciate this fact. Thus, if, as in the present case, the whole record demonstrates that the verdict was within the realm of the jury's province, the verdict will not be disturbed. The parties received exactly what they chanced: a verdict.

Accordingly, the judgment from which the appeal is taken is affirmed.

Affirmed.

CERDA and GREIMAN, JJ., concur.